IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| DAVID G. MANGOLD, | : | CIVIL ACTION |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 19-5912 |
| | : | |
| PECO ENERGY, | : | |
| | : | |
| *Defendant.* | : | |

---

**Goldberg, J.**                                                                 **December 23, 2021**

## <u>MEMORANDUM OPINION</u>

In 2015, Defendant PECO Energy Company ("PECO") implemented an initiative called the Accelerated Workplace Diversification ("AWD") program in an effort to increase the diversity of its workforce. Plaintiff David Mangold, a white male who worked for PECO, contends that, as a result of this program, he was discriminated against and constructively terminated from his position. He brings claims against Defendant pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA").

Defendant seeks summary judgment on the entirety of Plaintiff's Complaint. For the following reasons, I will grant Defendant's Motion and enter summary judgment in favor of Defendant.

## I.    STATEMENT OF FACTS

Unless so indicated, the following facts are uncontested.[1]

---

[1]      My Policies and Procedures provide that "[t]he papers opposing a motion for summary judgment shall include as a separate exhibit a short and concise statement of the material facts, which respondent contends present genuine issues for trial. The statement should respond to the numbered paragraphs set forth in the moving party's Statement of Undisputed Facts. The responding party shall also set forth, in separated numbered paragraphs, any additional facts which the respondent contends preclude summary judgment. The Court will accept all material facts set forth in the moving party's statement as admitted unless controverted by the opposing party." (J. Goldberg's Policies and Procedures ¶ 12.)

Here, Defendant submitted a forty-nine page Statement of Undisputed Facts containing well over four hundred paragraphs. Notwithstanding the unwieldy and excessive length of this Statement, Plaintiff

### A.    <u>The Parties</u>

PECO Energy Company ("PECO") is an energy services company that constitutes Pennsylvania's largest electric and natural gas utility.  It is an indirect subsidiary of Exelon Corporation ("Exelon"), an energy services company headquartered in Pennsylvania.

Plaintiff, a white male, worked as a Senior Business Analyst for PECO's Marketing Services department from November 24, 2014 to the date of his resignation on February 26, 2018.  (Def.'s Ex. 1.)  Prior to working as a PECO employee, Plaintiff was employed by Calico Energy, and then worked as a contingent worker/contractor for PECO from July 2013 until he became a full-time Senior Business Analyst.  (Def.'s Ex. 2, Dep. of David Mangold ("Mangold Dep."), Day One, 84:18–87:01.)

### B.    <u>Other Individuals Employed by PECO</u>

As this case centers on the interactions between Plaintiff and both his supervisors and members of Human Resources, some understanding of the other individuals involved is helpful.

#### 1.    <u>Plaintiff's Supervisors</u>

During his tenure at PECO, Plaintiff reported to or worked with several other individuals, including Paul Miles, a white male to whom he directly reported.  (<u>Id.</u> at 124:16–24.)  Plaintiff also received feedback from other peer managers including Vien Cash (Asian female) and Kathleen MacWilliams (white female).  (<u>Id.</u> at 62:20–63:4.)

Mr. Miles reported to Sabrina Brooks (black female), who was the Senior Manager of the Marketing Department.  (Def.'s Ex. 2, Mangold Dep., Day Two, 179:18–24; Def.'s Ex. 4, Dep. of

---

disregarded my Policies and Procedures and failed to either respond to that statement or provide a counter-statement of facts.  Indeed, Plaintiff offered only a non-numbered recitation of facts at the outset of his Response to the Motion for Summary Judgment.  Many of these "facts" contain no citation to any evidence of record.

Given these circumstances, crafting a complete yet concise statement of facts for purposes of this opinion has been challenging to say the least.  Nonetheless, and pursuant to my Policies and Procedures, to the extent the enumerated facts in Defendant's Statement are supported by the cited evidence, and not contradicted by evidence proffered by Plaintiff, I will deem them admitted.  Although I also consider Plaintiff's non-numbered recitation of facts in his brief, I will only accept such facts to the extent they are supported by reference to a specific exhibit.

Sabrina Brooks ("Brooks Dep."), 12:8–20.)  Aside from Mr. Miles, four other managers reported to Ms. Brooks:  Michael O'Leary (white male), Liz Finocchio (white female), Kathleen MacWilliams (white female), and Vien Cash (Asian female).  (Brooks Dep. 14:2–24.)

Ms. Brooks reported to Kathleen Lentini (white female), who was Director of Energy and Marketing Services.  (Brooks Dep. 13:1–25; Def.'s Ex. 5, Dep. of Kathleen Lentini ("Lentini Dep.") 19:4–7.)  Five other managers reported to Ms. Lentini, including Sharon Simpson, Ramesh Santana Christian, Jim Reilly, Phil Eastman, and Nick DiDomenicus.  (Lentini Dep. 19:16–19.)

Ms. Lentini reported to Anthony (Tony) Gay, a black male, who was the Vice President of External and Governmental Affairs.  (Lentini Dep. 69:1–5; Def.'s Ex. 6, Dep. of Anthony Gay ("Gay Dep.") 14:15–25.)  Mr. Gay, in turn, reported to Elizabeth Murphy (white female) who was Senior Vice President of the Division.  (Gay Dep. 13:2–12.)

To summarize the relevant chain of command:

Elizabeth Murphy (white female)



Tony Gay  (black male)



Kathleen Lentini (white female)



Sabrina Brooks (black female)



Paul Miles (white male)



Plaintiff (white male)

2.    <u>Human Resources and Security Personnel</u>

Mary Krick (white female) was the Vice President, Chief Human Resources Officer at PECO during the time period relevant to this case.  (Def.'s Ex. 7, Dep. of Mary Krick ("Krick Dep.) 14:22–15:1.)  In that position, she reported directly to Amy Best (white female), Chief Human Resources Officer of Exelon.  (<u>Id.</u> at 15:16:2.)  Ms. Krick, in turn, reported to Christopher Smith (white male), the

Human Resources Business Partner who supported Human Resources functions for External and Governmental Affairs.  (Id. at 16:23–17:20.)  Mr. Smith was hired at PECO in 2016 and promoted to Principal HR Business Partner in January 2020.  (Def.'s Ex. 8, Dep. of Christopher Smith ("Smith Dep."), 53:13–22.)

Michael Melvin (white male) served as Senior Manager of PECO Security.  (Def.'s Ex. 9, Dep. of Michael Melvin ("Melvin Dep."), 11:1–21.)  In 2018, Mr. Melvin was promoted to Director, Security Programs and Compliance for Exelon Utilities, a subsidiary of Exelon Corporation.  (Id.)

Thomas Marshall (white male) is currently employed as a Senior Manager of Corporate Security at PECO, a position to which he was promoted in 2018, as Mr. Melvin's replacement.  (Def.'s Ex. 10, Dep. of Thomas Marshall ("Marshall Dep."), 12:6–13:16.)  He was originally hired as an investigator, then was promoted to security manager reporting to Mr. Melvin.  (Id. at 13:8–23.)  Lou DeShullo (white male) worked for Mr. Marshall in Corporate Security.  (Id. at 94:18–95:23.)

C.    PECO's Affirmative Action Programs

As a federal contractor, Exelon, Defendant's parent company, is required to take affirmative action to recruit and advance qualified minorities, women, persons with disabilities, and covered veterans. 30 F.R. 12319 (Sept. 24, 1965), as amended by Exec Order No. 11375, 32 F.R. 14303 (Oct. 13, 1967); (Def.'s Ex. 22.)  Under Exelon's Federal Affirmative Action Plan ("FAAP") agreements with the U.S. Department of Labor's Office of Federal Contract Compliance Programs, Exelon was required to examine and ensure that its personnel practices would allow equal employment opportunity for applicants.  (Def.'s Ex. 23.)  Neither Plaintiff's position nor any position within the External and Governmental Affairs division were listed as subject to an FAAP during the time that Plaintiff worked for Defendant.  (Def.'s Ex. 24; Krick Dep. at 55:1–56:3.)

As part of its obligations, Exelon incorporated diversity and inclusion standards into its Exelon Code of Business Conduct ("COBC").  (Def.'s Exs. 25, 26, 28.)  In 2015, Defendant determined that there were still critical gaps in the areas of hiring and retention of diverse employees and sought to

4

implement a plan to increase the diversity of its workforce.  (Def.'s Ex. 27.)  In an original draft presentation of Defendant's plan, the Accelerated Workforce Diversification ("AWD") Program, Defendant included one slide describing "[a]n aggressive scenario aiming to achieve 50% diversity within five years using the Nuclear business as an example."  (Def.'s Ex. 29, at p. 15.)  This scenario "require[d] a significant swap of non-diverse employees with diverse employees on an annual basis for five years."  (Id.)  It further noted that "[a] change of this magnitude would require additional actions to create space for 750 diverse new hires as the normal rate of attrition alone does not create sufficient opportunity."  (Id.)

According to Nicole Durham, the Vice President, Diversity & Inclusion for Defendant, Defendant "knew that this type of aggressive approach would not be practical or legal and [Defendant was] never planning to adopt it."  (Def.'s Ex. 28, ¶ 20.)  Ms. Durham explained that this slide was designed "for illustrative purposes" and the final Executive presentation circulated on July 24, 2015 neither included this slide nor made any reference to changing current white male headcounts.  (Id. ¶¶ 21, 23.)  Indeed, Exelon ultimately adopted a more measured approach that "simply required intentional focus on creating a diverse slate of candidates, while remaining equitable and ensuring a competitive process."  (Id. ¶ 22.)  More specifically, Defendant created a goal of achieving a seven percent increase in diverse headcount over five years by increasing the flow of diverse talent coming into the company, improving development and advancement strategies, and improving retention strategies.  (Def.'s Ex. 27 at 3.)  This goal was framed by the legal principle of "recruiting a pool of diverse candidates and hiring, promoting, and retaining the best qualified candidate without regard to race/gender."  (Id. at 4.)

On November 30, 2015, Chris Cane, the white male CEO of Exelon, issued the following message to all employees regarding the upcoming launch of Exelon's AWD initiative:

> As you known Exelon's footprint extends across the nation, reaching a customer base that is rich in diversity.  And, as a major service provider, we need to ensure that our organization represents the communities we serve.  I believe that we have the opportunity to leverage our diversity beyond our bottom line. Employment within the Exelon family of companies enables individuals and

families to build legacies of personal wealth and quality education for their children. This creates greater sustainability for our company and, importantly, allows us to change lives.

Our diverse workforce and inclusive leadership enable our business success. Though we have made some progress in improving our diversity and inclusion in recent years there is more work to be done. **I am challenging every part of the organization to drive an increase in our diverse headcount of at least 7 percent enterprise-wide by the year 2020**. We will begin measuring progress against this goal in January 2016. To make this goal, we must continue to attract diverse talent to Exelon, but also to retain it.

Meaningful progress will require dedicated support and continuous engagement by all executives and their leadership teams, in partnership with Human Resources. As you complete the 2015 performance assessment process within your organizations, pay close attention to each leader's contribution to D&I [diversity and inclusion] within Exelon. Some leaders may have done extraordinary outreach to diverse candidates and improved our hiring success. Others may have served as a mentor or are actively participating in one of our ERGs. These examples demonstrate our willingness to move the company forward, and must be factored into each executive's performance.

(Def.'s Ex. 30 (emphasis in original).)

As a follow-up, Exelon Senior Vice President and Chief Human Resources Officer, Amy Best, issued another message to leaders regarding the initiative. (Def.'s Ex. 31.) She commented that "we have a goal of increasing our diverse talent headcount by at least 7 percent by the year 2020. To build sustainable progress in this area, it is expected that D&I performance will be integrated into performance evaluations for all executives. Performance should not be solely focused on quantitative hiring or headcount metrics but also on qualitative leadership behaviors." (Id.) Ms. Best clarified that the AWD initiative focused not just on race, but on gender, ethnicity, sexual orientation, people with disabilities, and veterans. (Id.)

Nonetheless, in the years following the AWD rollout, the white male population at Exelon remained relatively unchanged, and PECO has never met the AWD goal. (Def.'s Exs. 32, 33.) Ms. Krick, Chief Human Resources Officer, explained that she has never been penalized either financially or in her performance evaluations for not meeting this goal. (Krick Dep. 80:12–21.) She testified that the AWD was an initiative that put together "an aspirational goal to look at ways to better diversify the

workforce, and it was primarily focused on how we are working in the community and how we are recruiting across the communities in which we do business and are we creating an equal or level playing field for applicants for opportunities as they become available across Exelon." (Id. at 28:1–7.) The white male headcount at PECO was higher from 2017–2019 than it was in 2016 when AWD was announced. (Def.'s Ex. 34.)

Following the implementation of this program, an employee named Fred Kirschbaum, a former Senior Recruiter in Defendant's Human Resources department, filed a complaint in federal court alleging that "[a]s part of the AWD goals, all Recruiters were required to consider the race and ethnicity of an applicant during the hiring process. Furthermore, in order to achieve an increase in diversity of 7%, over 70% of all external hires had to be diverse candidates, and the Respondent would have to terminate currently employed Caucasian males." (Pl.'s Ex. K.) Furthermore, Mr. Kirschbaum asserted that all Vice Presidents were required to achieve the AWD goal as a "tier one" financial goal, and if said goal was not met, monetary penalties would result. (Id.) Prior to discovery or any dispositive motions being filed in the case, the parties resolved this matter. Kirschbaum v. PECO, 18-cv-3750 (E.D. Pa.)

In June of 2017, PECO implemented the "The White Men and Allies Learning Lab," which was training for the senior management team across all of Exelon. (Pl.'s Ex. B, Mangold Dep., 24:19–25:5.) Ms. Krick explained that it was a three-day training regarding race and gender to foster discussion about people's experiences in different groups, *i.e.* what it is like to be a white female or black male, etc. (Id. at 26:12–24.) The Lab resulted in a summary document, which was created as a reflection of the lab experience and which summarized some of the discussions that occurred. The document contained lists, as generated by the participants, of hopes, concerns, courage statements, assumptions about white men, assumptions about men of color, assumptions about women of color, impacts of white male culture on various groups, and questions for various groups. (Pl.'s Ex. D.)

C.     **Plaintiff's Claims of Discrimination**

1.     The February 2018 Incident

In late 2017, Plaintiff received a "Limited Impact" performance rating (the lowest possible) on his annual review.  (Pl.'s Ex. E, Dep. of Paul Miles ("Miles Dep."), 53:23–54:3.)  Plaintiff's manager, Mr. Miles, testified that a limited impact rating is given after everyone who works with an employee weighs in on their specific experiences, and then Ms. Brooks, the Senior Manager of the Marketing Department, approves the rating.  (Id. at 70:15–20, 72:9–14.)  Mr. Miles indicated that although he advocated for Plaintiff to receive a higher rating, others saw things differently.  (Id. at 74:18–75:4.)  Nonetheless, Miles explained that, after attending the meeting with other supervisors, the decision was made objectively based on Plaintiff's behaviors and it was "almost impossible to defend against the decision that was made."  (Id. at 76:10–78:2.)

Sometime in the afternoon of February 13, 2018, months after the issuance of the performance rating, Plaintiff requested a meeting with Ms. Brooks to discuss the rating.  (Def.'s Ex. 42.)  Ms. Brooks testified that the meeting was unscheduled, odd, and definitely out of the ordinary.  (Def.'s Ex. 4, Dep. of Sabrina Brooks ("Brooks Dep."), 168:1–25.)  Indeed, Plaintiff admitted that in the three years he worked with Ms. Brooks, he only met with her in her office "once, maybe twice."  (Def.'s Ex. 2, Mangold Dep., Day 2, 37:19–38:03.)[2]  In the entire time Brooks had been with the company to date, no other employee had asked to talk to her about their rating.  (Id. at 119:15–17, 179:18–180:8.)

When Plaintiff came into Ms. Brooks's office, he was holding papers, which he placed on her table.  She noted that he was fidgeting a bit.  (Id. at 76:8–16.)  He then asked if she followed QAnon, a known conspiracy theory group.  (Id. at 76:17–77:12.)  Plaintiff told her that this group talked in codes on the Internet and revealed secrets about the government if you could decipher the codes.  (Id. at 77:16–

---

[2]     Plaintiff and Defendant use two different versions of Plaintiff's deposition with different pagination.  Each party references their own pagination when citing the deposition, making it almost impossible for me to cite to one version of the deposition.  Accordingly, for purposes of clarity, I will cite to the version of Plaintiff's deposition applicable when referring to a particular fact.

24.)  At that point, Plaintiff was sitting and wringing his hands, and Ms. Brooks asked what else was going on.  (Id. at 80:18–20.)  Plaintiff indicated that he had a really tough year in his job in 2017 and that he wanted to "play a game" with her.  (80:21–81:6.)  When Ms. Brooks asked him to please talk to her about his concerns, he declined to tell her and instead gave her the papers he had brought in and asked her to decipher the codes written on them.  (Id. at 81:10–17.)  At that point, she said "okay" because she did not want to continue the conversation.  (Id. at 82:5–11.)  He then said that, to get her started with the game, he was going to give her three clues:  VC equals Vien Cash; KM is Kathy MacWilliams, and LN is Lou Naylor.  (Id. at 82:9–15.)  He indicated that he was leaving for a business meeting and then going on vacation, and then he got up, left the papers with the codes, and walked out of her office.  (Id. at 82:16–83:2.)

Plaintiff's version of the meeting was somewhat different.  He said that he went into the meeting with the codes because he did not want her to "take things wrong" and wanted to "have a fun time" to explain what was on his mind.  (Pl.'s Ex. H, Mangold Dep., 372:10–21, 417:1–15.)  Plaintiff explained that when she did not understand what was going on "from the get-go," he switched gears right away and intended to talk about the "timeline."  (Id. at 417:1–15)  Plaintiff testified that they "had a very pleasant conversation" that ended abruptly when she had to get on another call, and because of his upcoming travel, they never had a chance to finish their conversation.  (Id. at 431:2–13.)  During the conversation, Plaintiff stated that he told Ms. Brooks about his dog rescuing, jogging, that he was a Trump supporter and wanted to get a job in Washington, and that, in his spare time, he was a conspiracy researcher looking into QAnon.  (Id. at 432:12–433:22.)  Plaintiff denied ever saying the phrase "play a game" and claimed the codes were more of an exercise.  (Id. at 415:5–8.)

Just after the meeting, Ms. Brooks reported this conversation to Christopher Smith in Human Resources, who stated, "we'll talk to [Plaintiff] when he gets back to the office."  (Brooks Dep. 103:10–17.)  Ms. Brooks then called Ms. Lentini and said that she had just had a meeting with Plaintiff that "kind of spooked her."  (Def.'s Ex. 5, Dep. of Kathleen Lentini ("Lentini Dep.") 12:12–17.)  Ms. Brooks

shared the paper with the codes on it with Ms. Lentini, Director of Energy and Marketing Services.  (Id.)
The following morning, Ms. Brooks reported her interaction with Plaintiff to Mike Melvin, the
manager/director of PECO security.  (Brooks Dep. 107:17–108:5.)  Ms. Brooks described the meeting
with Plaintiff and provided Mr. Melvin with copies of the codes that Plaintiff had given to her.  (Id. at
109:8–17.)  Mr. Melvin recalled that Ms. Brooks was "visibly shaken," was crying, and was expressing
her concern for other employees.  (Def.'s Ex. 9, Dep. of Michael Melvin ("Melvin Dep.), 73:22–7.)  Mr.
Melvin then related these events to Tom Marshall and assigned him as the lead investigator.  (Id. at
22:11-16.)

In her deposition, Ms. Brooks explained that the meeting felt threatening because, "[t]hese are
people on my team that he had a direct conflict with, so, yes, I felt threatened by that, because, although
he didn't say anything personally threatening to me, he talked about people that he had disagreements
with, so that was threatening."  (Brooks Dep. 89:12–17.)  She elaborated that the meeting made her
"extremely nervous because, again, there have been a number of incidents going on in our country with
workplace violence and, at that time, I didn't know what was going on.  David had never come across
as being someone that would do that, but who does?  The fact that we had this exchange was very un-
nerving to me, extremely."  (Id. at 98:16–23.)

Because Plaintiff was out of the office on vacation until February 26, 2018, Security could not
interview him until his return.  (Def.'s Ex. 42.)  In the interim, Security contacted Joseph Orenstein, an
Intelligence Analyst with Defendant, and requested assistance regarding Plaintiff's codes, a review of
his social media, and a review of his network access.  Mr. Orenstein found no Exelon network-based
communications of concern, identified no derogatory information on Plaintiff's social media accounts,
and was able to decipher some of the codes.  (Def.'s Ex. 47.)

On February 26, 2018, two members of PECO Security, Tom Marshall and Lou Deshullo
interviewed Plaintiff.   (Def.'s Ex. 42, 48.)   The interview began at about 8:15 a.m. and lasted
approximately one hour.  (Melvin Dep. 40:11–22.)  Mr. Melvin was present at the beginning of the

interview but not for the duration.  (<u>Id.</u> at 34:2–5.)  He testified that, before the interview began, Plaintiff slid his company ID, key to his desk, and company credit card over to him.  (<u>Id.</u> at 34:20–23.)  Mr. Melvin slid these items back to Plaintiff and told him that they were just there to interview him about his meeting with Ms. Brooks.  (<u>Id.</u> at 34:24–35:3.)

According to the Security Investigation report, Plaintiff described to the Security officers his understanding of the events in question.  He indicated that, on December 28, 2017, he had a meeting with Mr. Miles to discuss his "Limited Impact" rating, and Mr. Miles communicated that the rating decision was made by other PECO Marketing Management peers because of "terse emails" that Plaintiff sent throughout the year.  (Def.'s Ex. 42)  Plaintiff remarked that Mr. Miles told him that he felt Plaintiff deserved an "Extraordinary Impact" rating, the highest an employee could achieve.  Accordingly, Plaintiff decided to speak with Ms Brooks since he liked her, wanted to "clear the air" regarding his perceived poor performance, and believed he could help correct the team's opinion of him.  (<u>Id.</u>)

Initially, in his description of the meeting, Plaintiff denied any knowledge of offering to "play a game" with Ms. Brooks or providing her with a sheet of codes, but, when investigators reminded him of his duty to answer questions honestly, Plaintiff admitted that he provided Ms. Brooks with a copy of codes, stating it would be the best way to describe what was on his mind.  (<u>Id.</u>)  Plaintiff then explained that he was recently certified as a Scrum Master—a form of IT software project manager related to work efficiency—and that, during his certification courses, the instructor would play games involving code breaking, which Plaintiff believed would be an effective platform to share his feelings with Ms. Brooks. (<u>Id.</u>)  When investigators indicated that Ms. Brooks felt threatened, he clarified that he did not mean to upset her or threaten anyone else.  (<u>Id.</u>)  He also deciphered each code, which described details and projects associated with his work product throughout the year.  (<u>Id.</u>)  Plaintiff then stated that he believed PECO undervalued his work product and as a result of that fact, as well as the pending investigation, he planned to return home to Wisconsin within the next few weeks.  (<u>Id.</u>)  Plaintiff also apologized for his actions, stating that, in hindsight, he understood how they could be perceived as threatening.  (<u>Id.</u>)

In his deposition, Plaintiff offered a different version regarding the interview.  He claimed that the Security investigators that questioned him asked him to resign a number of times, giving him fifteen minutes to decide.  (Def.'s Ex. H, 88:14–89:5.)  Indeed, Plaintiff remarked that throughout the whole investigation, he was given multiple opportunities to quit, and the investigators wanted to get his resignation, promising that it would be on good terms.  (Id. at 482:19–484:23.)  Plaintiff refused to resign since "this was his career."  (Id. at 621:4–24.)  Plaintiff also stated that the interviewers insulted him by asking "Wanna play a game?" and "You're a smart guy.  Why would you do something so stupid."  (Id. at 397:21–24.)  Ultimately, at the end of the interview, Plaintiff was given a document to sign, which he believed was inaccurate, but felt that he was under duress to sign.  (Id. at 395:5–398:16.)

At around 9:30 a.m. that same day, just after the interview with Plaintiff was complete, Mr. Melvin and Mr. Marshall held a second meeting with PECO Human Resources, Ms. Lentini, and Ms. Brooks.  (Def.'s Ex. 49, 55, 56, 57.)  At that time, Mr. Melvin and Mr. Marshall informed the attendees that, based on the interview with Plaintiff, they did not believe that Plaintiff was threatening Ms. Brooks with his codes.  (Melvin Dep. 38:2–39:20; Marshall Dep. 41:13–43:17.)  None of the attendees expressed any desire that Plaintiff be terminated.  (Melvin Dep. 79:7–80:8.)  Indeed, Mr. Marshall indicated that he did not make any recommendations about the outcome.  (Marshall Dep.  43:18–20.)

Following that meeting, and again on the same day, Human Resources decided that Plaintiff should be relieved of duties with pay pending completion of the investigation.  (Smith Dep. 37:13–38:15.)  Mr. Melvin testified that this was normal practice with respect to an open investigation.  (Melvin Dep. 41:3–9.)  Cognizant that this letter was being drafted, Mr. Melvin returned to Plaintiff and told him "Hey, HR is going to be down to talk to you.  I don't know if that's going to be in ten minutes, 15 minutes . . .  We're going to be in our staff meeting.  Again, you can hang here.  You know, if you'd prefer to hang in the lobby of the building or out front, you know, wherever, just you have to be readily available to us when HR comes down . . ."  (Melvin Dep. 41:10–21.)  Shortly thereafter, Mr. Smith of Human Resources provided Plaintiff with the letter advising that he was relieved of duties pending the

outcome of the investigation.  Mr. Smith collected Plaintiff's badge, company credit card, and desk key, which is standard practice.  (Id. at 44:6–13.)  Mr. Melvin then walked Plaintiff out of the building, told him that this was a pending investigation and no formal decision had been made, and advised him not to complicate the matter by returning at this point.  (Id. at 44:17–45:24.)  At 11:35 a.m., Mr. Smith sent an email to the attendees of the Human Resources meeting advising of the events.  (Def.'s Ex. 58.)

Plaintiff testified, however, that Security "asked [him] to resign," and he felt pressured to do so because otherwise he would not be able to leave on good terms.  (Pl.'s Ex. H, 716:18–717:4.)  He explained that:

> So I guess my termination was a foregone conclusion based upon the treatment by security.  They interrogated me like a criminal.  They called me creepy, not interested in anything I wrote down on my outline.  They assumed my guilt from the very beginning and given—they were giving me opportunities to resign instead of get to the truth.  If they were really doing a security investigation, would they do any of this stuff?  I was escorted out of the building like a criminal.  I was given a note saying I wasn't allowed to go on PECO property.  I had no job left.  I had no corporate identity.  I had no card.  I had nothing.  And I had what I would say is important work still to do.  I guess—there was no way for me to stay on good terms and the writing was on the wall, so that's—no doubt in my mind that's a discharge or termination as a matter of law.

(Pl.'s Ex. H, 719:1–20.)

Security interviewed Plaintiff's supervisor, Paul Miles, the next day, and he told Security that, just prior to this interview, he received a voicemail from Plaintiff stating that Plaintiff resigned from his position.  (Def.'s Ex. 42.)  Mr. Miles then told Security that Plaintiff was "wound really tight," struggled to get along with his peers, and had an inflated perception of his value to the company, but Mr. Miles did not believe Plaintiff was a violent person.  (Id.)  Mr. Miles also stated that Plaintiff required a lot of personal management to complete his tasks.  (Id.)  He explained that when he delivered Plaintiff's poor year-end review, Plaintiff originally did not appear overly upset, but later began writing "parables" to Mr. Miles to express his feelings.  (Id.)  Mr. Miles also remarked that Plaintiff would often react viscerally to team members through email, which was upsetting to those other employees.  (Id.)  Finally,

Mr. Miles stated that, approximately six months ago, Plaintiff had expressed his interest in changing jobs to become a software developer.  (Id.)

Security subsequently drafted a summary report of its investigation concluding that Plaintiff had not engaged in workplace violence or threats.  (Melvin Dep. 66:3–5.)  As noted, however, Plaintiff had already resigned.

In his deposition, Plaintiff claimed that he quit because:

> I was forced to—I was forced to quit because if I didn't, I very much believe that they would find that I—through their sham of an investigation, that they were going to find me as a violent white supremacist racist, and I couldn't afford to have that attached to me. . . . I wanted to keep working for Exelon.  I wanted to get a job of a—somebody I worked with in 2008, when they retired, and so I wanted to leave on good terms, and I was forced out . . . . [I quit] because they investigated me right and left, they gave me a—some sort of confession to sign to keep my job, and security asked me to resign, they folded their arms, all three of them, they said they were going to give me 15 minutes to decide . . . So at the end of the day, after I was told that I could quit on good terms, I—instead of being called a white racist for the rest of my life, have that attached to me, and to be able to continue to work for Exelon I hoped back at ComEd, I answered Chris' email, "I'm out."

(Def.'s Ex. 2, Mangold Dep., Day One, 87:2–90:6.)

When asked why he believed the company would find that he was a "violent white supremacist racist," Plaintiff explained that he had had a conversation with Ms. Brooks where he brought up the fact that he was a Trump supporter and was interested in the QAnon phenomenon.  Based on his volunteered statements, he "conclude[ed] that because I—given PECO's obvious toxic culture against white males, that Sabrina had to know that she would be believed above me, especially as a supervisor and a black female supervisor at that, and that my leaving would help with their diversity goals.  (Id. at 92:1–13.) Plaintiff went on to testify that the people investigating him had "confirmation bias" and all wanted him to be guilty because of the accelerated workforce diversification and the fact that his leaving would help the diversity numbers.  (Id. at 95:17–96:5.)

14

      2.      <u>EEOC Charge</u>

On September 21, 2018, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") asserting that he "believe[d] [he] was discriminated against on the basis of my race plus sex (White male), in that I was paid a lower annual bonus and was discharged from employment, in violation of Title VII of the Civil Rights Act of 1964, as amended."  (Def.'s Ex. 12.) He indicated that two women in his department "micro-aggressed" against him and were working together.  The two female mangers decided to "downgrade" him, costing him $3,500 of his bonus, and directors did not defend him appropriately.  (Def.'s Ex. 13.)  Plaintiff also alleged that in 2016, PECO rolled out the Accelerated Workforce Diversification ("AWD") which gives vice-presidents a higher bonus if they get more diverse employees.  (<u>Id.</u>)  He asserted that AWD was "clearly a rogue program that MUST by definition, get rid of your white, male workforce, the VP's bonus depends on it!  I believe the managers were IN on getting me fired, discrediting my good work, and helping their 'diversity' challenge."  (<u>Id.</u>)  Finally, Plaintiff asserted that his separation occurred "when the department head, an African American woman, took a personal note I had with me (was unintelligible to anyone but myself) and gave it to corporate security, who called it creepy and thought it contained a threat – well there was no threat, it's all garbage. . . . Big picture – 3 females conspired against me, and my direct boss, a coward, did nothing to defend me."  (<u>Id.</u>)

Plaintiff then filed a second statement with the EEOC.  He remarked that Paul Miles's "claims of my poor performance and work behavior is nothing more than Symantec backfill to try to explain the sudden change in attitude towards me, which is only explainable in seeing an opportunity to weaken, shame, and get rid of another white male so the VP can make his diversity quota and therefore claim his big payday when the bonus money is paid in."  (Def.'s Ex. 14.)  Plaintiff subsequently filed an Amended Charge with the EEOC, adding a retaliation claim.  (Def.'s Ex. 15.)  He alleged that "I complained of race and sex discrimination to my boss and nothing was done about it.  I believe one reason I was terminated was because I complained of discrimination."  (<u>Id.</u>)

The EEOC closed its investigation on September 18, 2019.  It then advised Plaintiff that it was "unable to conclude that the information obtained establishes violations of the statutes."  (Def.'s Ex. 17.)

### D.     Procedural History

On December 16, 2019, Plaintiff filed a Complaint against Defendant setting forth claims of discrimination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Pennsylvania Human Relations Act.  Following discovery, Defendant moved for summary judgment on all claims.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart

Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered

evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

Plaintiff brings claims for racial discrimination and retaliation under Title VII, 42 U.S.C. § 1981,

and the PHRA.   For purposes of assessing claims such as the ones presented herein, Title VII and

the PHRA have been interpreted in a similar fashion.  Ahern v. Eresearch Tech., Inc., 183 F. Supp. 3d

663, 668 (E.D. Pa. 2016) (citing Dici v. Commw. Pa., 91 F.3d 542, 552 (3d Cir. 1996) (the PHRA is

applied in a similar manner as Title VII)).  Likewise, race-discrimination claims brought under Title VII

and § 1981 are analyzed under the same burden-shifting scheme.  Collins v. Kimberly-Clark Pa., LLC,

247 F. Supp. 3d 571, 588 (E.D. Pa. 2017), aff'd, 708 F. App'x 48 (3d Cir. 2017).  Accordingly, I address

all of these claims together.

Defendant's Motion for Summary Judgment asserts that there is no evidence to support either

(1) Plaintiff's claims that he was terminated based on his race and gender; or (2) Plaintiff's claim that

Defendant denied him lateral or promotional opportunities on the basis of his race and gender.[3]

### A.   Claims of Termination Based on Race and Gender

To establish a claim of discrimination, a plaintiff must show that an employer had a racially

discriminatory animus against an employee, and that the animus resulted in a challenged action, such as

dismissal, failure to promote, or failure to hire.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir.

1983).  A plaintiff may succeed in a discrimination claim against an employer either by (1) providing

direct evidence of unlawful discrimination, or (2) relying on indirect evidence of discrimination through

the McDonnell Douglas burden-shifting scheme.  McIlvaine v. ISEO Techs., Inc., 485 F. Supp. 3d 582,

585 (E.D. Pa. 2020) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999)).

---

[3]      Defendant also seeks summary judgment as to any retaliation claim Plaintiff may raise.  I need
not address this argument because although Plaintiff raised a retaliation claim in his amended charge to
the EEOC, no such claim is present in his Complaint here.  Moreover, Plaintiff does not even mention,
let alone attempt to establish, a retaliation claim in his Opposition to the Motion for Summary Judgment.

Here, Plaintiff concedes that there is no direct evidence of discrimination.  (Pl.'s Opp'n Summ. J. 16.)  Absent direct evidence of discrimination, a plaintiff must rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  To establish a *prima facie* case of racial discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999).

If the plaintiff establishes a prima facie case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981).  Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  Id.  Finally, if the employer meets its burden of production, the plaintiff bears the ultimate burden of convincing the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Defendant contends that Plaintiff fails to establish a *prima facie* case because he cannot show, under the third and fourth elements, either that (a) he was subject to an adverse employment action or (b) race and gender were factors in his termination.  Alternatively, Defendant argues that Plaintiff has not created any genuine issue of material fact regarding whether Defendant's legitimate non-discriminatory reason for termination was mere pretext for discrimination.

1.  <u>Adverse Employment Action</u>

Under the third element of a *prima facie* case, "[t]he Supreme Court has interpreted 'adverse employment action' to mean 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" <u>Remp v. Alcon Labs., Inc.</u>, 701 F. App'x 103, 106–07 (3d Cir. 2017) (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).    In the context of a discrimination claim, "[a]n adverse employment action involves activity by an employer 'that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" <u>Reyes v. AutoZone, Inc.</u>, No. 08-cv-847, 2009 WL 4559454, at *5 (W.D. Pa. Dec. 2, 2009) (quoting <u>Storey v. Burns Int'l Sec. Servx.</u>, 390 F.3d 760, 764 (3d Cir. 2004) (citation omitted)). "Lateral transfers, changes of title, and different reporting relationships, generally do not constitute adverse employment actions." <u>Id.</u> (citing <u>Langley v. Merck & Co., Inc.</u>, 186 Fed. Appx. 258, 260 (3d Cir. 2006)).  Likewise, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." <u>Homel v. Centennial Sch. Dist.</u>, 836 F. Supp. 2d 304, 323 (E.D. Pa. 2011) (quoting <u>Clegg v. Ark. Dept. of Corrs.</u>, 496 F.3d 922, 926 (8th Cir. 2007) (further quotations omitted)).

"Unless there is a claim for 'constructive discharge,' an employee's voluntary resignation does not constitute an adverse employment action." <u>Larochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658, 705 (E.D. Pa. 2016).  To establish a constructive discharge, "a plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign." <u>Green v. Brennan</u>, 578 U.S. 1084 (2016); <u>see also</u> <u>Mandel v. M&Q Packaging Corp.</u>, 706 F.3d 157, 169 (3d Cir. 2013) (noting that to prove constructive discharge, an employee must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.") (quoting <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1084 (3d Cir. 1996).  The court must employ an objective test and "thus an employee's

19

subjective perceptions of unfairness do not govern a claim of constructive discharge." Mandel, 706 F.3d at 169. "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n.4 (3d Cir. 2006) (quotations omitted).

Notably, "[n]o finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. A plaintiff-employee may prevail on a claim of constructive discharge by establishing that "the conduct complained of would have the *foreseeable* result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." McIlmail v. Pennsylvania, 381 F. Supp. 3d 393, 411–12 (E.D. Pa. 2019) (quoting Suders v. Easton, 325 F.3d 432, 444 (3d Cir. 2003)) (further quotations omitted)). The United States Court of Appeals for the Third Circuit identified the following factors that may be indicative of constructive discharge: (1) threat of discharge; (2) suggesting or encouraging resignation; (3) demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations. Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993).

Taking the evidence in the light most favorable to Plaintiff, I find that a genuine issue of material fact exists as to whether Plaintiff was constructively discharged. Plaintiff testified that, both at the Security meeting and in his conversation with Christopher Smith, he was told that if he resigned that day, he could leave on good terms. Immediately following both the interview with Plaintiff and the HR meeting, Plaintiff claims he was escorted off the property, told he could not return until directed, and instructed to turn in his ID, credit card, and key. As Plaintiff stated, "there was no way for me to stay on good terms and the writing was on the wall." (Pl.'s Ex. H, 719:1–20.) Although Plaintiff ultimately did not quit until the next morning, he remarked that he felt forced to quit because he otherwise would have been terminated and had a stigma attached to him. (Def.'s Ex. 2, 87:2–90:6.) As a reasonable jury

could find that such circumstances rose to the level of a constructive termination, I decline to grant Defendant's Motion on this ground.[4]

      2.   <u>Whether There Is Evidence that Race and Gender Were Factors in the Adverse Employment Decision</u>

Under the fourth element of a *prima facie* case, a plaintiff can satisfy his burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." <u>Equal Employment Opportunity Comm'n v. Metal Serv. Co.</u>, 892 F.2d 341, 348 (3d Cir. 1990). One way that a plaintiff can make such a showing is by demonstrating that he was treated less favorably than similarly situated employees outside of the protected class. <u>Jones</u>, 198 F.3d at 413. Alternatively, a plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." <u>Greene v. Virgin Islands Water & Power Auth.</u>, 557 F. Appx. 189, 195 (3d Cir. 2014).

In a reverse discrimination case such as the one before me—where the allegations are discrimination against a majority race—the Third Circuit has clarified that "all that should be required to establish a prima facie case . . . is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." <u>Besko v. NJ Juvenile Justice Comm'n</u>, 558 F. App'x 295, 298 (3d Cir. 2014) (quotations omitted). While "similarly-situated" does not necessarily mean identically situated,

---

[4]     Although Plaintiff's Response in Opposition to the Motion for Summary Judgment does not raise his negative performance review as an adverse employment action, it is well established that results of a performance evaluation do not constitute an adverse employment action unless they have some "tangible effect upon the recipient's employment." <u>Turner v. Gonzales</u>, 421 F.3d 688, 696 (8th Cir. 2005) (quoted in <u>Foster v. Ashcroft</u>, No. 05-cv-1734, 2006 WL 1995305, at *2 (D.N.J. July 14, 2006)); <u>see also</u> <u>Cashman v. CNA Fin. Corp.</u>, No. 08-cv-5102, 2012 WL 113667, at *12 (E.D. Pa. Jan. 13, 2012) ("A negative performance review and being placed on a performance improvement plan, without more, is not an adverse employment action.").
     As Plaintiff identifies no tangible effects on his employment suffered as a result of his "Limited Impact" rating in 2017, I will not consider it further.

the plaintiff must nevertheless be similar in "all relevant respects."  Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222–23 (3d Cir. 2009) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)). This often requires a showing that the relevant aspects of the plaintiff's employment situation are "'nearly identical' to those of the co-workers that plaintiff alleges were treated more favorably."  Hobson v. St. Luke's Hosp. & Health Network, 735 F. Supp. 2d 206, 214 (E.D. Pa. 2010) (citing Solomon v. Philadelphia Newspapers, Inc., No. 05-cv-5326, 2008 WL 2221856, at *15 (E.D. Pa. May 21, 2008)). Demonstrating that employees are similarly-situated often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Opsatnik, 335 F. App'x at 223 (quotations omitted). To that end, a plaintiff must show "that the other employee's acts were of 'comparable seriousness' to his own infraction."  Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988)). Whether a particular fact or circumstance is relevant for purposes of a "similarly-situated" analysis must be determined by the context of each case.  Hobson, 735 F. Supp. 2d at 214 (citing Houston v. Easton Area Sch. Dist., 355 F. App'x 651, 654 (3d Cir. 2009)).

Where the plaintiff asserts that the discrimination resulted from a company-wide affirmative action policy, he or she must establish a causal connection between that policy and the adverse employment action.  Mere evidence that the affirmative action policies are "aspirational" does not constitute persuasive evidence of discrimination against the majority.  McHenry v. Pa. State Sys. of Higher Ed., 50 F. Supp. 2d 401, 412 (E.D. Pa. 1999).  Even if a plaintiff produces evidence about a company's intent to "ameliorate the underrepresentation of certain groups," the plaintiff must show that such policies were actually relied upon in making the hiring/termination decision at issue.  Id.

Here, the entirety of Plaintiff's argument in support of this element of the prima facie case asserts:

It is beyond dispute that the separation of Mr. Mangold from PECO was initiated by a complaint of threatening and potentially violent conduct made by Ms. Brooks.  An inference can be made that the complaint was motivated, at least in part, by the fact that Plaintiff was a white male.

It is not necessary that Plaintiff point to the current political and cultural milieu in this country which surrounds this case to support the inference that his being a white male and his self-identification as a Trump supporter with an interest in the QAnon phenomenon stereotypes or marked him, as the "White Men and Allies Learning Lab" which PECO sent its Vice Presidents to demonstrate[] associations between whiteness, support of President Trump, racism and even violence in the statements of the PECO executives who were participants.  The concerns of the white males in the "Lab" are very relevant to Plaintiff and his circumstance:  they expressed a concern that their being white would cause certain views to be attributed to them 'unfairly.'  They also expressed a concern with being stereotyped as white males and Trump supporters, and the comments about their assumed support of Trump associated them with "disturbing and scary behavior."

The backdrop of PECO's AWD program and its concern with diversity, extravagantly expressed in the proposed aggressive posture of the "Big Hairy Arduous Goal," which proposed a "swapping" of diverse for nondiverse in the workforce, and its actual implementation as indicated in the sworn statements of Mr. Kirschbaum that connected its discriminatory application to the very dictates of the COO of PEO reveal a corporate environment that overarches the distinct actions of the players in this case, whose "diverse" characteristics (a predominance of female and/or minority individuals in high ranking executive positions) and actions in the larger corporate reality.  The perceptions of Mr. Mangold's supervisor, Mr. Miles, expressed in private that he was not going to be promoted and as a result of this corporate environment bring that reality home to the smaller division or unit of PECO involved in this case.  His perceptions were also shaped by his being rejected for a promotion to the vacated supervisory position directly above him when it went to Ms. Brooks.  While it is not known if Mr. Miles is aware of the reasons for the rejection, the testimony of record as to why he didn't get the job was that he didn't interview well.

The actions of Ms. Brooks—beyond identifying Mr. Mangold as a potential threat—show her bias against white males.  She went out of her way, without any foundation whatsoever, to try to implicate Mr. Miles in Mr. Mangold's "conspiracy," going out of her way to identify him a potential co-conspirator in whatever nefarious designs she unfairly ascribed to Mr. Mangold as a fellow employee "with performance issues."   The only low impact ratings she personally gave to direct reports were reserved for Mr. Miles and Mr. O'Leary, both white males.  She hired a black female to fill a spot under Mr. Miles when Plaintiff was separated from the company.  She suggested and advocated for a low impact rating for Mr. Mangold when two female managers made negative remarks about him after Mr. Miles had presented his recommendation that Mr. Mangold receive a higher, intermediate rating.

> In short, the record contains sufficient evidence supporting an influence [sic] that unlawful racial considerations played a factor in the treatment that Plaintiff received at PECO.

(Pl.'s Opp'n Summ. J. 18–20.)

Nothing in this argument or the substantiating evidence creates any plausible inference connecting Plaintiff's low performance rating, Defendant's investigation of Plaintiff, or Plaintiff's ultimate resignation, under circumstances he believed constituted constructive termination, with any discriminatory intent by Defendant based on either race or gender. As set forth in detail above, the AWD adopted by Defendant involved an aspirational approach to creating a diverse slate of candidates and achieving a seven percent increase in diverse headcount over five years by increasing the flow of diverse talent coming into the company, improving development and advancement strategies, and improving retention strategies. (Krick Dep. 64:2–66:7.) Plaintiff presents no evidence suggesting that the AWD initiative or the fact that Plaintiff is a white male bore any role in Ms. Brooks's decision to report her meeting with Plaintiff to Security or Security's decision to investigate Plaintiff and suspend him with pay. Indeed, Plaintiff concedes that (a) he unilaterally initiated a business meeting to purportedly discuss his performance evaluation; (b) he approached his supervisor with codes; (c) he identified certain co-workers with whom he had a conflict within the codes; and then (d) he volunteered information about his interest in QAnon. Ms. Brooks testified—and there is no evidence to the contrary—that she never described Plaintiff as a violent or threatening individual, only that Plaintiff's refusal to discuss the details of his concerns and insistence on "play[ing] a game" with codes made her feel threatened.

Even taking as true Plaintiff's entire account of the conversation with Ms. Brooks, Plaintiff does not raise any plausible argument—beyond mere speculation—that the fact that he was a white male engaging in these actions, as opposed to a female or a member of a different race, made any difference in Ms. Brooks's reaction to them. Indeed, Plaintiff effectively admits that it was not the nature of his being a white male that raised Ms. Brooks's concerns, but rather the fact that he used codes to try to communicate and volunteered that he followed QAnon conspiracy theories. Ultimately, whether Ms.

Brooks should have objectively felt threatened by the content of Plaintiff's communication to her is of no moment.  The fact remains that, according to all of the evidence before me, it was precisely that conversation—and not Plaintiff's race, gender, or desire to meet a diversity initiative—that triggered Ms. Brook's decision to report Plaintiff to Security immediately following this meeting.

Plaintiff also does not connect Security's subsequent investigation of him with any inference of discrimination.  Two white males, neither of whom had any clear incentive to advance the AWD initiative, conducted the interview.  Plaintiff admitted that he was presented with the codes he had given to Plaintiff and asked to decipher them.  Plaintiff does not suggest that the Security officers made any comments about his race, his gender, or even his political beliefs.  Moreover, Plaintiff does not identify any non-white or female employee who engaged in similar conduct and was treated better or even differently than Plaintiff.

In a last-ditch effort to create an inference of discrimination, Plaintiff identifies several isolated pieces of evidence, none of which satisfy his legal burden.

First, Plaintiff contends that the AWD initiative corresponded with an actual increase in the percentage of nondiverse people in Defendant's workforce.  However, as the Third Circuit has recognized, "having a diverse workforce does not violate Title VII:  'an employer has every right to be concerned with the diversity of its workforce, and work environment.'"  Musa v. Soar Corp., No. 12-cv-2847, 2014 WL 6809019, at *7 (E.D. Pa. Dec. 1, 2014) (quoting Iadimarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999)).  "Employer initiatives to increase racial diversity within a workplace in order to 'enable [an organization] to effectively service an increasingly diverse customer base' are lawful 'to say nothing of the laudable goal of expanding the horizons of opportunity for more and more members of this great pluralistic society.'"  Id. (quoting Reed v. Agilent Techs., Inc., 174 F. Supp. 2d 176, 186–87 (D. Del. 2001)).  "Unless a plaintiff can demonstrate that a defendant employer's 'approach to diversity had some negative impact upon his individual employment situation, the mere existence of a policy promoting diversity awareness is not evidence of discrimination' under Title VII."  Id. (quoting Reed,

174 F.2d at 185); see also Opsatnik, 2008 WL 763745, at *11 (holding that "to use diversity concerns, without more, as evidence of discrimination would be irresponsible").

Second, Plaintiff argues that the relevant management personnel in Plaintiff's business unit were predominantly *not* white males, but rather diverse personnel.   But Plaintiff fails to link the existence of such diversity with any showing of discrimination against him or white males in general.   Simply because Plaintiff's reporting chain included white males, white females, black males, and black females does not, without more, reflect discrimination in his termination decision.   To suggest otherwise would create an inference of discrimination every time a nondiverse manger or supervisor is hired or promoted over a white male.[5]   Moreover, I would be remiss to ignore that numerous other members of Defendant's executive team were, in fact, white males.

Finally, Plaintiff suggests that just after Plaintiff left the company in 2018, a black female named Youtha Fletcher was hired to work under Mr. Miles.   Based on this fact, Plaintiff contends that he was replaced with a member of a different race and gender.   This argument, however, is unsupported by any evidence.   As Plaintiff admitted in his deposition, Ms. Fletcher had been employed as a contractor with Defendant and, before Plaintiff ever resigned, she became a full-time employee and reported directly to Mr. Miles.   (Def.'s Reply Br. Ex. B, 143:9–144:17.)   As such, by Plaintiff's own concession, she could not have replaced him.[6]

---

[5]      Plaintiff references the lawsuit by Fred Kirschbaum who made similar allegations that Defendant engaged in a pattern and practice of discrimination in an effort to promote its AWD initiative, and that he was terminated in retaliation for refusal to comply with AWD.  Mr. Kirschbaum's litigation was ultimately settled by the parties prior to any discovery or dispositive motions being filed.  Neither party deposed Mr. Kirschbaum in connection with this case, and Plaintiff relies solely on Mr. Kirschbaum's statements made in his complaint.  Plaintiff has not shown how unproven allegations in a separate complaint have any bearing on whether Plaintiff here suffered discrimination.  As such I decline to engage in full-blown litigation of Mr. Kirschbaum's case.

[6]      It is also notable that, upon the departure of Vien Cash, an Asian female manager who also reported to Ms. Brooks, Ms. Brooks hired a white male as her replacement.  (Def's Reply Br., Ex. A, 42:2–7.)

In short, Plaintiff has failed to adduce any evidence from which a reasonable juror could plausibly infer that either Ms. Brooks's reporting of Plaintiff to Security, Security's investigation, or Defendant's "constructive termination" of Plaintiff pending the outcome of the investigation were related to either his race or gender.  The mere existence of Defendant's company-wide initiative to increase diversity in its workforce does not, without more, allow any reasonable factfinder to make the broad, and otherwise unsubstantiated leap, that this initiative was the catalyst behind what was, by all accounts, an individualized employment decision.  Accordingly, I find that Plaintiff has not met his burden of establishing a *prima facie* case of discrimination.

            3.   Whether Plaintiff Can Prove Pretext

Finally even assuming Plaintiff could establish a *prima facie* case, Defendant has articulated a legitimate non-discriminatory reason for its decision.   Specifically, as articulated by Ms. Brooks, Plaintiff's actions during her meeting were perceived as threatening to other employees.  She explained that:

> [H]e named people [when deciphering some of the codes] that he had a direct conflict with.  That is threatening to me.  These are people on my team that he had a direct conflict with so, yes, I felt threatened by that, because although he didn't say anything personally threatening to me, he talked about people that he had disagreements and conflicts with, so that was threatening . . . I felt threatened by David because he would not answer my questions.  The threatening nature of it was that he wanted to play a game, which is a very odd term for anyone in a professional environment to say to anyone, especially when a manager says, I don't play games, let's have a conversation.  That was very odd.  He refused to have a conversation but wanted to have me play a game with him and talk in terms of codes, that is threatening, yes, especially when he mentioned employees that he had direct conflicts with.  As a manager, I had to take action on that.

(Brooks Dep. 89:02-90:25, 93:14–94:20.)

In the face of a non-discriminatory reason for Defendant's subsequent actions towards Plaintiff, Plaintiff must establish that the explanation is simply pretext for discrimination.  In order to substantiate an assertion of pretext, a plaintiff must provide the court with sufficient "'evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Michaels v. BJ's Wholesale Club, Inc., 604 F. App'x 180, 182 (3d Cir. 2015) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). The evidence must allow a factfinder to infer that Defendant's nondiscriminatory basis for termination "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764.  Moreover, the plaintiff must do more to show that the decision was wrong or mistaken because the issue is whether the defendant was motivated by discrimination, not whether the decision was "wise, shrewd, prudent or competent."  Id. at 765.  Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'"  Id. at 765.

Plaintiff identifies no such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Defendant's reasons.  Rather, as noted in detail above, Plaintiff concedes that he unilaterally initiated a meeting with Ms. Brooks to discuss a performance review he received months earlier.  During that meeting, he engaged in conduct which Ms. Brooks, rightly or wrongly, deemed threatening to other employees, and, on that basis, she reported him to Security.  Security then immediately conducted an investigation and relieved Plaintiff of his duties pending completion of their investigation.  Before any final decision was made, Plaintiff resigned, believing he had no other choice. Regardless of whether Defendant's actions rested on a misunderstanding of or overreaction to Plaintiff's behavior, nothing in the undisputed facts suggest that Defendant's decisions were a mere pretext to remove a white male from his position in an effort to advance its diversity objectives.

*d.*   Conclusion

In short, I find that no genuine issue of material fact exists as to whether Plaintiff was constructively terminated based on his race and/or gender.  Plaintiff has produced no evidence suggesting that he was terminated under circumstances giving rise to an inference of discrimination.

Moreover, Plaintiff has failed to establish that Defendant's legitimate non-discriminatory reason for its investigation of Plaintiff was pretext.  Accordingly, I will grant summary judgment in favor of Defendant on this claim.

### B.  Claims of Denial of Lateral or Promotional Opportunities Based on Race and Gender

Although not addressed in his opposition to Defendant's Motion for Summary Judgment, Plaintiff's Complaint raised a single allegation that, "[d]uring the course of his employment, Plaintiff also applied for transfers and promotions that were given to less qualified non-white and/or female employees, and Defendant also promoted or transferred other co-workers of Plaintiff to a level or position Plaintiff had expressed interest in without posting for the position or giving Plaintiff an opportunity to apply, including both a Hispanic male and a white female from the same work group as Plaintiff."  (Compl. ¶ 26.)  Defendant now contends that it is entitled to summary judgment on this claim.

For failure to promote claims, "[t]he initial burden is on the employee" to show that "(1) [he or she] is a member of the protected class, (2) [he or she] sought and was qualified for the promotion, (3) [he or she] was rejected for the promotion, and (4) a non-member of the protected class was treated more favorably." Young v. Pennsauken Twp. Sch. Dist., 47 F. App'x 160, 161 (3d Cir. 2002).  If an employee makes out this *prima facie* case, the burden shifts to the employer to produce a legitimate non-discriminatory reason for the employee's rejection.  Id.  If the employer produces a legitimate reason, the burden then shifts back to the employee to show pretext.  Id.

I find that Plaintiff has not met his burden on the failure to promote claims for several reasons. First, to the extent Plaintiff claims that he was denied purely lateral transfers, the refusal to grant a purely lateral transfer does not, by itself, amount to adverse employment action.  Fallon v. Meissner, 66 F. App'x 348, 351 (3d Cir. 2003); see also Rosati v. Colello, 94 F. Supp. 3d 704, 715 (E.D. Pa. 2015) ("Nor was [plaintiff's] reassignment to [a lateral police unit] an adverse employment action.  Minor actions, such as lateral transfers and changes of title and reporting relationships, generally do not suffice to constitute adverse employment actions."); Woods v. Salisbury Behavioral Health, Inc., 3 F. Supp. 3d

238, 249–50 (M.D. Pa. 2014) ("In cases where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that a denial of such a transfer would be a materially adverse action." (citation omitted)).   An employee's subjective preference for a different position is insufficient to establish an adverse employment action.  See Swain v. City of Vineland, 457 F. App'x 107, 110–11 (3d Cir. 2012) (citation omitted).

Second, to the extent Plaintiff asserts that he was denied promotions to various jobs due to his race and/or gender, Plaintiff has produced no evidence to substantiate his claim.   Indeed, the sole evidence on this issue shows that during his tenure as a full-time employee with Defendant, Plaintiff applied for six positions, four of which went unfilled and for which no one was hired, and the other two of which were filled by white female candidates.  (Def.'s Ex. 96; Def's Ex. 131, ¶¶ 7–11.)   The first of the two filled positions was for a Principle, Specialists, Business IT.  (Def.'s Ex. 96.)   The selected candidate met all the minimum qualifications with over eight years of both IT experience and management experience, and also met the "preferred" qualification of having a graduate degree.  (Def.'s Exs. 96, 99, 100.)   The other position was for IT manager, and the selected candidate had over twelve years of both substantive IT experience and management experience and also possessed the "preferred" qualification of a graduate degree.  (Def.'s Ex. 101, 102.)   By contrast, Plaintiff's resume reflected that he had only been with Defendant for three years and with Calico Energy Services for six years.  (Def.'s Ex. 103.)   He had no substantive IT experience and did not meet the "preferred" qualification of having a master's degree.  (Id.)

Absent some evidence that Plaintiff was qualified for the job or that a less qualified candidate was selected for the sought-after position, Plaintiff cannot succeed on this claim.   Accordingly, I will grant summary judgment in favor of Defendant.

## IV.   CONCLUSION

Title VII, § 1981, and the PHRA exist to protect against discrimination based on—among other things—race or gender.   These statutes are not available to correct all perceived employment wrongs.

Although Plaintiff attempts to link the events in question to Defendant's AWD initiative and a workplace climate seeking to create diversity among the workforce, the record is devoid of evidence showing that any of the events at issue were even remotely connected to this initiative or that Plaintiff was discriminated against as a white male.  Given the absence of any evidence on which a reasonable jury could find in favor of Plaintiff on any of his claims, I will grant summary judgment for Defendant.

An appropriate Order follows.